DENNIS K. BURKE
United States Attorney
District of Arizona

JENNIFER LEVINSON
Assistant United States Attorney
Arizona State Bar Number 020551
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Facsimile: (602) 514-7537
jennifer.levinson@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>            Plaintiff,<br><br>   v.<br><br>1. One Double-Rimmed Basket and<br>2. One Wood-Framed Box Containing Various Perishable Artifacts,<br><br>            Defendants. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff, United States of America, through its attorneys, DENNIS K. BURKE, United States Attorney for the District of Arizona and Jennifer Levinson, Assistant United States Attorney, brings this complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"):

**NATURE OF THE ACTION**

1.  This is an action to forfeit property to the United States pursuant to 16 U.S.C. § 470gg.

**THE DEFENDANTS IN REM**

2.  The defendants consist of the following property: 1) one double-rimmed Basket and 2) one wood-framed box containing various perishable artifacts, turned over to agents of the

1

United States Department of the Interior, Bureau of Land Management ("BLM") on June 10, 2009 by Dan King at his residence in Tucson, Arizona. The defendant artifacts are currently in the custody of the Federal Bureau of Investigation which has granted adoptive custody to the BLM.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

4. This Court will have *in rem* jurisdiction over the defendants upon the Court's issuance of an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), and the execution of said arrest warrants on the defendants pursuant to Supplemental Rule G(3)(c).

5. Venue is proper in this district:
   a) pursuant to 28 U.S.C. § 1355(b)(1)(A), because the acts or omissions giving rise to the forfeiture occurred in this district; and
   b) pursuant to 28 U.S.C. §§ 1355(b)(1)(B) and 1395(b), because the defendants were found in this district.

## BASIS FOR THE FORFEITURE

6. The defendant artifacts are subject to forfeiture pursuant to 16 U.S.C. § 470gg as they constitute archaeological resources involved in a violation/violations of 16 U.S.C. § 470ee(b).

## FACTS

**Background**

7. Dan and Monica King ("the Kings") are husband and wife.

8. They are collectors of Native American artifacts.

9. They buy and sell artifacts.

10. They sell artifacts out of their home.

11. The Kings often sell artifacts through the website eBay using the seller name

"anakam."

12. They also sell artifacts on the following websites: www.prehistoriccollector.com and www.rarepottery.info.

13. A review of the website www.rarepottery.info on May 29, 2009 revealed the following:

    a. Photographs and descriptions of ceramic bowls and jars, which were identified as being associated with Prehistoric Native American cultures in Arizona and Mexico over 100 years old, such as Mogollon, Hohokam, Salado, Sinagua and Casas Grandes;

    b. An index of pottery types;

    c. A description of Prehistoric Native American cultures;

    d. Photographs of Prehistoric pottery items that appeared to have been reconstructed from pieces;

    e. Photographs and descriptions of pottery items from modern Native American tribes;

    f. A photograph gallery;

    g. An offer to buy artifact collections;

    h. An offer for their artifact authentication services.

14. A Confidential Source working with the Federal Bureau of Investigation ("FBI"), Ted Gardiner ("Gardiner"), had several video-recorded contacts with Dan and/or Monica King with regard to artifact collecting and trading.

15. The first of these contacts occurred when Gardner met the Kings at their residence on April 3, 2008.

16. Inside the residence were several rooms with shelves containing hundreds of archaeological artifacts.

17. During this contact, Dan King showed Gardiner, among other things, the double-

rimmed basket that is one of the subjects of this forfeiture action.

18. Dan King indicated to Gardiner that the basket was found in a cave on the Salt River, in the Mogollon Rim area.

19. Dan King indicated that the basket was very rare.

20. He also indicated that the basket would be valued at approximately eleven to twelve thousand dollars or more.

21. During the contact, Dan King also showed Gardiner a wood-framed box containing various artifacts.

22. These artifacts were "perishables," meaning that they were composed of organic material.

23. Such material is subject to deterioration/decomposition when exposed to various environmental conditions such as sun, wind and rain.

24. Dan King stated that the perishable artifacts contained in the wood-framed box were personal finds from "McEuen Cave," near Safford, Arizona.

25. He indicated that they recently sold a similar perishable artifact collection from McEuen Cave and are awaiting payment.

26. The Kings led Gardiner back to the main room of the residence where they showed him a second wood-framed box containing perishable artifacts.

27. They indicated that those artifacts had also been removed from McEuen Cave.

28. The Kings indicated that they were holding those artifacts for a customer.

29. During a contact between Gardiner and the Kings on May 30, 2008, Dan King sold some perishable artifacts contained in a shadow box to Gardiner for $1800.

30. Dan King indicated that the artifacts had been removed from McEuen Cave during the 1960's or 1970's.

31. The Kings shipped the artifacts to Gardiner's address in Utah via the United States Postal Service.

32. The Kings provided Gardiner a certificate, signed by Monica King, indicating that the artifacts were "23 cave perishables" found on "private land located at McEuen Site."

33. The contents of the shadow box included sandals, basket fragments, cordage and weavings.

34. In an e-mail from the Kings at rarepotteryinfo@aol.com, dated July 31, 2008, they attached, "photos of a few more items from the McEuen Cave Site."

35. In the e-mail, they said that they, "need $1,600 for all the items in the photo. . . ."

36. Gardiner met with the Kings at a hotel in Santa Fe, New Mexico on August 17, 2008 during an artifact show.

37. At that time, Dan King explained that he was unable to bring his artifacts from McEuen cave, but would have them later if Gardiner was back in town.

38. Dan King explained that he had some, "McEuen Cave stuff. . . in a big Riker mount," and that certain, ". . . sandals [were] in individual Riker mounts."

39. On September 3, 2008, Gardiner purchased an additional shadow box containing perishable artifacts from the Kings for $1,600.

40. The shadow box included sandals as well as wood and plant artifacts.

41. The Kings also indicated that those artifacts were from McEuen Cave.

42. The receipt indicated that they were, "McEuen Cave perishables."

**Execution of Search Warrant**

43. On June 10, 2009, BLM law enforcement personnel assisted the Internal Revenue Service ("IRS") with serving a search warrant on the Kings' residence.

44. Dan and Monica King were both present at the time the search warrant was executed.

45. Hundreds of Prehistoric Native American artifacts were located throughout the residence and the surrounding yard.

46. Dan King admitted to agents that they do not have any permits to excavate or

5

remove artifacts from any public or tribal land.

47. He also indicated that everything in their collection could be over 100 years old.

**Double-Rimmed Basket**

48. The double-rimmed basket that is the subject of this forfeiture action was in plain view in the Kings' residence during the search warrant execution.

49. It was located on a shelf on the east wall of the bedroom on the southeast corner of the house.

50. BLM Law Enforcement Ranger Grady Cook ("LER Cook"), who was present at the residence, recognized the double-rimmed basket from a previous video-recorded contact between Dan King and Gardiner.

51. Dan King told LER Cook that he purchased the double-rimmed basket two-and-a-half to four years ago from a guy in Tucson who said he dug the basket himself from a cave while he was in college.

52. Dan King said that the man who sold it to them indicated that he found it in a cave that Emil Haury previously excavated.

53. Emil Haury was a well-known professor of archaeology at the University of Arizona in Tucson from the 1920s through the 1970s.

54. Dan King said that the man who sold them the double-rimmed basket said he found it under a grain storage feature in the cave after Haury's excavation.

55. Dan King also indicated that he believed the double-rimmed basket was associated with the Mogollon Prehistoric Native American culture.

56. Records found in the Kings home indicated that the double-rimmed basket was Mogollon and from approximately 1325 AD.

57. The records further state that they obtained the double-rimmed basket from Dan Bucholz.

58. The records indicate that the double-rimmed basket was found at Canyon Creek Ruin in 1975.

59. The records show that the Kings purchased the double-rimmed basket on July 4, 2007.

60. The double-rimmed basket is in excellent condition and is completely intact.

61. It shows little evidence of decomposition and natural weathering.

62. Arizona State Museum Curator/Collections Manager Mike Jacobs ("Jacobs") and Conservator Nancy Odegaard ("Odegaard") examined the double-rimmed basket and concluded that it was probably affiliated with the Mogollon Prehistoric Native American Culture of east-central Arizona.

63. Jacobs has managed the Prehistoric Native American artifact collection at the museum for many years.

64. Jacobs and Odegaard have concluded that the double-rimmed basket is more than 100 years old and constitutes material remains of past human life or activity which is of archaeological interest.

65. Jacobs and Odegaard noticed that the double-rimmed basket resembled similar baskets found at the Canyon Creek Ruin as published by Archaeologist Emil Haury in the 1930s.

66. Jacobs and Odegarrd also noticed that it closely matched a similar basket held in collections from McEuen Cave at the Arizona State Museum.

67. Jacobs found that the double-rimmed basket was composed of split Yucca fiber or Bear Grass.

68. Bear Grass is a plant that commonly grew in eastern Arizona.

69. Archaeological sites throughout east-central Arizona commonly show evidence of artifact looting.

70. The Salt River in the region of the Mogollon Rim is located on federal lands managed by the United States Forest Service and Fort Apache tribe.

71. The Salt River is located about fifty miles northwest of McEuen Cave and about thirty miles southeast of the Canyon Creek Ruin in central Arizona.

72. The Canyon Creek Ruin is located on White Mountain Apache tribal land.

73. The Salt River originates in east-central Arizona, with the confluence of the Black and White Rivers, near the community of Cedar Creek.

74. This area is located on the White Mountain Apache Indian Reservation.

75. The Salt River crosses central Arizona and terminates at the Gila River west of

Phoenix.

76. Nearly all of the land encompassing the Salt River between its headwaters and northeast Mesa is federal and tribal land managed by the United States Forest Service, White Mountain Apache, San Carlos Apache, Fort McDowell, and Salt River Indian Reservations.

77. Perishable items, due to their susceptibility to disintegration/decomposition when exposed to elements such as sun, wind, and rain, are almost always found in dry caves, rock shelters or cliff dwellings.

78. This is especially true of items that are still intact.

79. Areas capable of preserving perishable Native American artifacts are most likely to occur in rugged terrain on the federal and tribal lands identified above, and not on the private lands which the Salt River crosses between northeast Mesa and the Gila River west of Phoenix.

80. There are no known dry caves, rock shelters or cliff dwellings on the state or privately owned areas along the Salt River.

**Display Case Containing Perishable Artifacts**

81. At the time the search warrant was executed on the Kings' residence, Dan King showed LER Cook a wood-framed box containing various artifacts.

82. Dan King indicated that he purchased them in the early 1990s.

83. Dan King indicated that the artifacts were from a cave on McEuen Ranch near Safford, Arizona.

84. He stated that he purchased the items from Bill Schenck prior to 1994 for about $100.00.

85. When LER Cook explained that McEuen cave is on federal land, Dan King indicated that he was unaware that it is on federal land.

86. When asked if they knew how to read land status maps, the Kings indicated that they did.

87. LER Cook took out two land-status maps and showed the Kings where McEuen Ranch and McEuen Cave are located.

88. LER Cook pointed out that McEuen Cave is on federal land.

89. Dan King said that he has never been to McEuen Ranch.

90. He said that he relied on the word of others who said that McEuen Ranch was private property.

91. He then said that he does not want the artifacts if they are illegal.

92. The Kings then asked if they could donate the items to the BLM.

93. They subsequently agreed to sign the artifacts over to the BLM.

94. Dan King then signed a receipt for property for each of the items, voluntarily transferring possession of the items to the BLM.

95. Arizona State Museum Curator/Collections Manager Jacobs examined the artifacts.

96. Jacobs indicated that the shadow box contained four corn cobs, a gourd stem and five rind fragments, a mass of coarsely-spun yucca fiber, several fragments of multiple-ply yucca fiber cordage, two bone awl fragments, a desiccated yucca leaf fragment, three yucca fiber quids, a braided wide-leaf yucca sandal with rounded toe, a coil of raw material, possibly split Bear Grass stems for basket weaving, a Reed Grass arrow shaft fragment with intact nock end, a peeled stick, possibly an arrow fore shaft made of Arrow Weed and an Obsidian drill.

97. These items are material remains of past human life or activities which are of archaeological interest.

98. Each of the items contained in the shadow box are over 100 years old.

99. The items contained in the wood-framed box are all considered "perishable."

100. The items are in good condition indicating little exposure to weather elements.

101. In order to remain in such good condition, the items would have had to have been found in dry caves, rock shelters or cliff dwellings.

102. Several of the items contained in the shadow box closely matched similar artifacts in storage at the Arizona State Museum.

103. Similar objects and material held in the Arizona State Museum's collections are

affiliated with Prehistoric Native American Late Archaic period hunter-gatherers and Mogollon and Salado agricultural peoples.

104. In fact these objects are similar to objects and materials in the Arizona State Museum collections that were collected in dry caves, rock shelters and cliff dwellings in east-central Arizona and west-central New Mexico.

105. Many of those similar items in the Arizona State Museum were from McEuen cave.

106. McEuen Cave is a Prehistoric Native American archaeological site located on BLM-managed land approximately twenty miles northwest of Safford, Arizona.

107. McEuen Cave is a dry rock shelter.

108. There is private property near the community of Ft. Thomas, Arizona, about ten miles south of McEuen Cave.

109. One of the tracts located on the north side of the Gila River is known as McEuen Ranch and is owned by Gary McEuen.

110. Based on the terrain in that area, no caves, dry rock shelters or cliff dwellings exist on the private tracts of land in that area.

111. Those areas containing private property consist of flat, flood plain associated with the Gila River.

112. Caves can only occur in the terrain associated with the Gila Mountains to the north and other mountains to the south and west which are predominantly on federal lands.

**Permits for Removal of Artifacts from Federal/Tribal Land**

113. Since 1906, all agencies of the United States Department of the Interior (including the Bureau of Indian Affairs) and Department of Agriculture generally prohibit the removal of Native American artifacts from federal public lands and tribal lands unless the activity is authorized by a permit from the agency.

114. In coordination with the appropriate agency's cultural resource staff, permits are

issued to people who, at the time of issuance are archaeologists and have had professional training in archaeology.

115.   All artifacts removed from federal public or tribal lands pursuant to a permit remain the property of the United States.

116.   A person, or organization, who is authorized to remove Native American artifacts must arrange for their care and placement in a federally-recognized museum.  This is done in coordination with the appropriate agency's staff and often at the cost of the permittee.

117.   Neither the Department of the Interior nor the Department of Agriculture has ever had a policy of disposing of artifacts, through sale or other means, to private owners or other agencies.

118.   The Department of the Interior or Department of Agriculture may loan artifacts to other governmental or private institutions, but the items are considered federal property.

119.   Therefore, no permit could allow for the Kings to own either of the artifacts that are the subject of this Complaint.

## CLAIM FOR RELIEF

120.   Plaintiff repeats and realleges each and every allegation set forth in paragraph 1 through 119, above.  Based on the aforementioned facts and circumstances, the defendant artifacts are subject to forfeiture pursuant to 16 U.S.C. § 470gg as they constitute archaeological resources involved in a violation/violations of 16 U.S.C. § 470ee(b).

WHEREFORE, the United States of America prays that process of warrant *in rem* issue for the arrest of the defendant; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant be forfeited to the United States of America for disposition according to law; and that the United

...

States of America be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

RESPECTFULLY SUBMITTED this 9th day of November, 2009.

DENNIS K. BURKE
United States Attorney
District of Arizona

S/ Jennifer Levinson

JENNIFER LEVINSON
Assistant United States Attorney

12